IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Philadelphia Eagles, LLC,            :
                        Petitioner            :
                                :
                v.                    :
                                :
Workers' Compensation Appeal            :
Board (Abiamiri),            :  No. 165 C.D. 2016
                   Respondent  :  Submitted: September 30, 2016


BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE JOSEPH M. COSGROVE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                  FILED: March 6, 2017

      Philadelphia Eagles, LLC (Employer) petitions this Court for review of the portion of the Workers' Compensation (WC) Appeal Board's (Board) January 8, 2016 order affirming the Workers' Compensation Judge's (WCJ) decision granting Victor Abiamiri's (Claimant) Claim Petition and Petition for Penalties (Penalty Petition). There are two issues before this Court: (1) whether the WCJ erred by granting the Claim Petition and, (2) whether the WCJ erred by granting the Penalty Petition.[1] After review, we affirm.

---

[1] Employer's specific issues are: (1) whether legally-competent expert medical testimony supported the WCJ's finding that Claimant was not capable of playing professional football as of March 13, 2012; (2) whether legally-competent expert medical testimony supported the WCJ's finding that Claimant's April 20, 2012 injury was a natural consequence of his August 5, 2011 injury; and (3) whether the WCJ erred by granting the Penalty Petition. Because Employer's first two issues related to whether Claimant's April 20, 2012 injury was work-related, we consolidated them for purposes of discussion herein.

Claimant was under contract to play professional football as a defensive end for Employer for four seasons, beginning on March 1, 2007. On or about August 5, 2011,[2] Claimant suffered a **right** Achilles tendon rupture while attending Employer's training camp, and Employer was timely notified. On August 9, 2011, orthopedic surgeon Steven M. Raikin, M.D. (Dr. Raikin) surgically repaired Claimant's right Achilles tendon and, thereafter, Claimant underwent rehabilitation with Employer's athletic training staff. Employer did not issue a notice of compensation payable (NCP) or pay Claimant wage loss benefits. Rather, Employer paid Claimant his regular salary until his contract expired on March 13, 2012.[3] *See* Reproduced Record (R.R.) at 237a. Employer also gave Claimant a $55,000.00 severance payment when his contract expired. Claimant was thereafter considered a free agent.

On April 20, 2012, while Claimant was performing a "W" drill at "Power Train," a weight training facility in Cherry Hill, New Jersey, he suffered a **left** Achilles tendon rupture. That day, he requested of Employer's staff and was given a walking boot for his left foot. Claimant contacted Dr. Raikin who conducted a surgical repair of Claimant's left Achilles tendon on April 24, 2012. Claimant did not return to professional football. Claimant began working for Brown Advisory as a portfolio analyst on December 2, 2013.

On February 25, 2014, Claimant filed the instant Claim Petition seeking full disability benefits from August 5, 2011 through December 2, 2013, and partial disability benefits ongoing from December 2, 2013, plus medical benefits and counsel fees, for an injury described as "[t]orn right Achilles leading to the left

---

[2] According to the WCJ, "[t]he evidence suggest[ed that] the actual date of [] Claimant's injury was August 3, 2011." WCJ Dec. at 3 n.1. However, since the majority of the record references are to Claimant's August **5**, 2011 injury date, we will refer to that date as well.

[3] Claimant's four-year contract had been extended through the 2011/2012 season, due to Claimant's inability to play during the 2010/2011 season.

Achilles tear during rehabilitation." R.R. at 1a. In its answers, Employer "admitted that [C]laimant suffered a right Achilles tendon rupture while participating in training camp for [Employer] on August 5, 2011[,]" but denied that the left Achilles injury was work-related. R.R. at 4a.

Hearings were held before a WCJ on May 19, August 14 and October 16, 2014, and on January 23, 2015. By June 16, 2015 decision, the WCJ granted the Claim Petition and the Penalty Petition and directed Employer to pay a 50% penalty on all past-due compensation. The WCJ also ruled that Employer was entitled to a credit for the severance payment to Claimant. Employer appealed to the Board which, on January 8, 2016, reversed the WCJ's decision relative to the severance credit, but affirmed the WCJ's decision in all other respects. Employer appealed to this Court.[4]

Employer argues that the WCJ erred by granting the Claim Petition because the WCJ's findings that Claimant was not capable of playing professional football as of March 13, 2012, and that Claimant's April 20, 2012 injury was a natural consequence of his August 5, 2011 injury, were not supported by legally-competent expert medical testimony. We disagree.

> An injured employee seeking to obtain [WC] benefits for a work-related injury bears the burden of proving all elements necessary to support an award. Pursuant to Section 301(c)(1) of the [WC] Act [(Act)[5]], 77 P.S. § 411(1), an employee's injuries are compensable if they (1) arise in the course of employment and (2) are causally related thereto. Further, an employee must demonstrate that he is disabled as a consequence of the work-related injury. The term

---

[4] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

[5] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2708.

'disability' is synonymous with an employee's loss of earning power.

*Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 75 n.4 (Pa. Cmwlth. 2012) (citations omitted). This Court has specifically held that "[WC] benefits are not intended as a remedy where the claimant's loss in earnings is attributable to factors other than the work injury[,]" such as the end of a professional football player's contract. *Battles v. Workers' Comp. Appeal Bd. (Pittsburgh Steelers Sports, Inc.)*, 82 A.3d 477, 480 (Pa. Cmwlth. 2013) (wherein the claimant was paid pursuant to his contract during his rehabilitation and thereafter was cleared to play football, but the employer declined to renew his contract to sign a better player).

Here, the parties do not dispute that Claimant's **right** Achilles tendon rupture was work-related. The issue before the Court is whether Claimant's **left** Achilles tendon rupture occurred while Claimant was rehabilitating his accepted work injury and, thus, was also work-related.

Claimant testified in support of his Claim Petition that, following the surgery on his right Achilles tendon, he received medical treatment and underwent rehabilitation at Employer's Novacare Complex practice facility, all of which was at Employer's expense. He explained, however, that once his contract expired and he was told that he was no longer able to use Employer's facility, he "continued doing [his] rehab at [Power Train - ] a facility [where he had previously] trained . . . ." R.R. at 24a; *see also* R.R. at 37a. Claimant stated that Employer paid for his right Achilles tendon rehabilitation at Power Train. *See* R.R. at 24a; *see also* R.R. at 37a.

Claimant recalled that at the time his left Achilles tendon injury occurred on April 20, 2012, he was working with a trainer, "doing some resistance training to try to build up [his] strength in his [right] Achilles." R.R. at 38a. He related that he was planting and cutting "to swirl out of a three[-]point stance" with resistance bands around his wrists, when his left foot injury occurred. R.R. at 39a. Claimant believed

4

that Employer paid for his left Achilles tendon repair surgery, but did not pay for any subsequent rehabilitation. *See* R.R. at 25a. He reported that he rehabilitated his left foot on his own. *See* R.R. at 40a.

"[I]n cases where . . . the causal relationship between the injury and the employment is not obvious, unequivocal medical testimony is required to establish this causal relationship."[6] *Rockwell Int'l v. Workers' Comp. Appeal Bd. (Sutton)*, 736 A.2d 742, 744 (Pa. Cmwlth. 1999). Here, Claimant presented the deposition testimony of Dr. Raikin in support of his Claim Petition.

Dr. Raikin testified that he specializes in treatment of the foot and ankle. He confirmed that he conducted both of Claimant's Achilles tendon surgeries, and continued to treat Claimant after each of them. According to Dr. Raikin's August 25, 2014 narrative report, Claimant's recovery progressed well after his August 9, 2011 right Achilles tendon surgery:

> By three months postoperatively, . . . he was walking full weight[-]bearing . . . . He was doing very well with physical therapy and working with his trainers without any complaints. He had good strength in the Achilles tendon and further rehabilitation was discussed with him as well as directly with the trainers with regard to activity resumption.
>
> At approximately six months out from surgical repair, on February 2, 2012, [Claimant] was seen again and had continued building up in his linear activities without any problems, but still had mid-calf muscle atrophy as compared to the contralateral side with a 10% deficit compared to the left side. At this point, his rehabilitation was advanced with a plan to get him back to full participation **with maximum recovery expected approximately one year out from the surgical construction**.

---

[6] "[M]edical testimony is unequivocal if a medical expert testifies, after providing foundation for the testimony, that, in his professional opinion, he believes or thinks a fact exists." *Amandeo,* 37 A.3d at 80 (quoting *O'Neill v. Workers' Comp. Appeal Bd. (News Corp., Ltd.),* 29 A.3d 50, 58 (Pa. Cmwlth. 2011)).

R.R. at 136a (emphasis added).

Dr. Raikin testified that although his goal with both surgeries was to effectuate repairs that would allow Claimant to return to professional football, he had "lesser expectations" after the second surgery. R.R. at 76a. Dr. Raikin's narrative report reflected that although Claimant's rehabilitation after the second surgery was uncomplicated, "[Claimant] was never able to regain the ability to do explosive and cutting maneuvers required for high-level participation in the National Football League [(NFL)] as a defensive end." R.R. at 136a.

Dr. Raikin declared that, as of Claimant's last examination on March 10, 2014,[7] Claimant had excellent strength upon resistance, excellent plantar flexion strength, normal reflexes, sensation and pulse, no tendon disruption, good resting tension, and satisfactory lower extremity strength in both ankles and Achilles tendons. *See* R.R. at 87a-89a. Dr. Raikin articulated that he did not advise Claimant against returning to professional football as of March 10, 2014. *See* R.R. at 96a-97a. However, he told Claimant that, "in [his] professional opinion[,] it would be highly improbable that [Claimant] would ever return to playing professional football again at the level and position that he had played before." R.R. at 100a.

In his August 25, 2014 narrative report, Dr. Raikin quoted a study published in the 2006 Journal of American Association of Orthopedic Surgeons in which it was shown that 36% of NFL players who suffer Achilles tendon ruptures never returned to play professional football. *See* R.R. at 90a, 137a. Dr. Raikin acknowledged that, although there have been players who returned to professional play within as few as eight months,

> [a]n Achilles tendon rupture, despite anecdotal cases with regard to this, generally with repair [] may only get 90 to

---

[7] Approximately six months before Dr. Raikin's deposition.

6

95% of [their] contralateral site normal with a single Achilles tendon rupture.

. . . .

With two Achilles tendon ruptures[,] **I do not even personally know of an anecdotal case of a professional football player whose had . . . [a]n Achilles rupture on two different legs that has got back to playing**. If there are any[,] I do not know of them. That would be very rare.

R.R. at 101a (emphasis added).

Relative to causation, Dr. Raikin opined within a reasonable degree of medical certainty as follows:

Q. . . . Can you tell me at any point during that period of time would [Claimant] be able to return to his duties as a professional football player?

A. No, he would not have been able to do so.

Q. Can you tell me why?

A. Initially because of the recovery on the one side. The **general recovery time** for an Achilles tendon rupture, **prior to resuming high-level activities such as professional[-]level football, would be approximately one year**.

**He ruptured his other Achilles tendon before ever being cleared to play** and after repair of the second Achilles tendon he just -- through combination of the two sides -- was never quite able to get back to the ability do to the explosive[-]type of high-level, high force, high intensity and high muscle power requirements that he would need to perform at a professional football player['s] level.

Q. That second surgery of April 24, 2012, what caused that?

A. **During his rehabilitation of his first tendon and while working with the trainers rehabilitating the right-hand side[,] he sustained a rupture on the left side**.

R.R. at 71a-72a (emphasis added).

7

With respect to Claimant's rehabilitation at Power Train, Dr. Raikin declared that although he may have made a recommendation regarding Claimant's rehabilitation, he would not have prescribed a particular course of treatment or recommended a specific facility at which the therapy should be conducted; rather, Employer's training staff would have specified where Claimant should go and what rehabilitation protocol would be followed. *See* R.R. at 81a-82a, 94a. However, he acknowledged that **Employer's head team physician Peter F. DeLuca, M.D. (Dr. DeLuca) prescribed physical therapy for Claimant on March 28, 2012, two weeks after Claimant's contract expired**. *See* R.R. at 98a-99a, 144a.

In defense of the Claim Petition, Employer presented the deposition testimony of Employer's head athletic trainer Christopher Peduzzi (Peduzzi), who stated that he was one of Employer's assistant athletic trainers when Claimant's right Achilles tendon injury occurred, and that he was involved in the direct care and rehabilitation of Claimant's right Achilles tendon after surgery. Peduzzi explained that **although Claimant was still receiving treatment at Employer's facility in the preceding weeks, and used the hot tub and performed correction exercises on his last day with Employer**, *see* R.R. at 169a-172a,

> as of March 13th, . . . [Claimant] was doing all functional skill work on the field, doing it very well, minimal discomfort, felt very confident in the fact with his contract expiring that by rules of the NFL he's not allowed to rehab with us or continue any further care here.
>
> When he left us, he was doing very well. Everything sports[-]specific got -- we would have had no issue with him participating -- we don't play football in March. But if we had a mini camp or something like that, we would have no issue with him participating in it at that time.

R.R. at 156a; *see also* R.R. at 173a. Peduzzi declared that while **he does not specifically recall evaluating Claimant on his last contract day**, he could tell from

8

notes he reviewed that Claimant "was having no issue with doing functional football activities for his . . . position[-]specific, functional skill pad." R.R. at 157a. Peduzzi represented that Claimant was physically capable of returning to regular football activity. *See* R.R. at 172a-173a.

Peduzzi pronounced that Power Train is a weightlifting gym/functional skill development center where many of Employer's players work out and train to get ready for the season, but Employer does not pay for it or have any other involvement with it. He opined, based upon his review of Claimant's Power Train strength program forms, that Claimant was attending Power Train for typical weight training, rather than specific rehabilitation purposes. *See* R.R. at 163a-164a.

Peduzzi recalled that after Claimant suffered his left Achilles tendon rupture, he contacted Employer's staff for a walking boot and explained that the injury occurred while he was performing a "W" drill. Peduzzi acknowledged that, although **a** "**W**" **drill** is not a specific rehabilitation technique for Achilles injuries, and no one instructed Claimant to do it for that purpose, it **is an exercise commonly performed by defensive players** "**to work on** [**their**] **explosiveness** both accelerating and back pedal." R.R. at 161a (emphasis added). Peduzzi stated that **Employer's defensive players** "**do them every day in practice . . . as part of their dynamic warm-up**." R.R. at 161a (emphasis added).

Employer also presented Dr. DeLuca's deposition testimony in which Dr. DeLuca stated that he evaluated Claimant on August 5, 2011, and referred him to Dr. Raikin. Dr. DeLuca explained that after a typical Achilles tendon rupture, the tendon heals and aggressive strength exercises are undertaken approximately three months after surgery, and most players are back playing within six to eight months post-surgery. *See* R.R. at 189a. He also explained that **he defers to operating surgeons for player injury clearances**;"[i]f the operating surgeon says they are

9

cleared from that injury, then I usually clear them also, saying that they are ready to play football." R.R. at 186a; *see also* R.R. at 185a.

Dr. DeLuca recounted that **after August 5, 2011, he only saw Claimant again during his December 30, 2011 post-season physical, at which time,** "[**Claimant**] **wasn't completely rehabilitated,**" **and he told Claimant to** "**continue rehab**." R.R. at 190a (emphasis added). He declared that since Power Train is a performance facility focused on improving strength and speed, rather than a rehabilitation facility, he did not specifically prescribe or direct Claimant to participate in a Power Train program to rehabilitate his right Achilles tendon injury. He pronounced that players do not typically go to places like Power Train until they are "fully rehab[ilitat]ed." R.R. at 187a.

Dr. DeLuca expressed that although Peduzzi is not a doctor, Peduzzi was fully capable of determining that Claimant could engage in football-related activities as of March 2012. *See* R.R. at 190a-191a. Dr. DeLuca further acknowledged that **Dr. DeLuca would defer to Dr. Raikin's opinions regarding Claimant's treatments**, but not his ability to return to football. *See* R.R. at 193a, 197a. Dr. DeLuca stated that his assistant Tracy[8] wrote Claimant's March 28, 2012 prescription stating: "PT evaluate and treat, diagnosis status post Achilles repair, right side. Two to three times a week for four to six weeks. Strengthening for Achilles repair." R.R. at 195a-196a; *see also* R.R. at 144a. Dr. DeLuca stated that Tracy commonly wrote physical therapy prescriptions, and she was qualified to do so "if she saw [the player]." R.R. at 195a. He suspected that Claimant called and requested a physical therapy prescription, and Tracy provided it. *See* R.R. at 195a. When asked if he agreed with Tracy's recommendation, Dr. DeLuca responded:

> I don't know if I would have recommended that. At that
> point[,] he should have been completely healed and ready to

---

[8] Tracy's last name does not appear in the record.

10

play [or] close to it. That is March, the end of March? . . .
So, that's eight months out from his surgery. He probably
would not have needed physical therapy at that point.

R.R. at 196a. However, **Dr. DeLuca admitted that he had seen Claimant only twice, and he did not review Claimant's medical records, and did not read Claimant's or Dr. Raikin's testimony**, but agreed that Claimant's left Achilles tendon repair was medically necessary. *See* R.R. at 194a, 197a-198a, 200a.

"Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Washington v. Workers' Comp. Appeal Bd. (State Police)*, 11 A.3d 48, 54 n.4 (Pa. Cmwlth. 2011) (quotation marks omitted). Further, the law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). "The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000).

Based upon the evidence presented in the instant case, the WCJ granted the Claim Petition, stating:

> Claimant established that he sustained a work-related right Achilles tendon rupture on August 3, 2011, and that 'but for' that injury, [] Claimant would not have sustained his left Achilles tendon rupture on April 20, 2012. Thus, [] **Claimant established that his left Achilles rupture was a natural consequence of his right Achilles tendon rupture, and is therefore work-related**.

WCJ Dec. at 11 (emphasis added). The WCJ specifically found that "Claimant has not fully recovered" but rather "continues to be totally disabled as a result of the August 5, 2011 work injury . . . ." WCJ Dec. at 10. In reaching his decision, the WCJ made the following credibility determinations:

11

14. . . . [T]his [**WCJ**] **finds** [] **Claimant to be a credible witness in all respects**. In making this determination, this [WCJ] considered all evidence including but not limited to [] Claimant's demeanor and deportment when testifying . . . . [] Claimant convincingly presented himself in a candid, forthright an non[-]evasive manner. I further considered the fact that the mechanism of the injury and [] Claimant's treatment history were generally consistent with the subjective complaints . . . [which] were generally supported by the credible medical evidence, particularly the expert testimony of Dr. Raikin and his surgical findings.

15. . . . [T]his [**WCJ**] **finds the medical testimony of . . . Dr. Raikin**[] **to be more credible than the testimony of . . . [Dr. DeLuca**]. In making this determination, this [WCJ] considered all evidence including but not limited to the fact that Claimant's mechanism of injury was consistent with the subjective complaints and supported by the initial treatment records as well as the operative findings. Further, Dr. Raikin had the benefit of treating and evaluating [] Claimant on multiple occasions over an extended period of time. Of particular significance to this [WCJ] was Dr. Raikin's testimony wherein he cogently explained his surgical findings and expected recovery time and rehabilitation regiment following the Achilles tendon rupture injury. In summary, the [WCJ] finds the opinions of [Dr. Raikin] to be closely reasoned, logical and sequential and supported by other credible medical evidence, particularly the operative reports. To the extent that the opinions of [Dr. DeLuca] differ from those of [Dr. Raikin], I specifically reject them. Significant in this determination is the fact that **Dr. DeLuca only saw** [] **Claimant on two occasions and exhibited limited knowledge of** [] **Claimant's case and medical condition**.

16. . . . [T]his [WCJ] finds the testimony of [Peduzzi] to be credible in part to the limited extent of his factual testimony. However, this [WCJ] rejects any medical opinions offered by [] Peduzzi when in conflict with the credible medical opinions of Dr. Raikin. While this [WCJ] recognizes [] Peduzzi possesses highly[-]specialized training, education and experience in the field of sports medicine, he is not a doctor and his opinions simply do not carry the same gravitas and weight as the opinions of Dr. Raikin, a highly-experienced orthopedic surgeon who twice

12

> operated on [] Claimant. In summary, to the extent []
> Peduzzi's testimony conflicts with the testimony of Dr.
> Raikin, it is rejected as not credible.

WCJ Dec. at 8-9 (emphasis added).

Neither the Board nor the Court may reweigh the evidence or the WCJ's credibility determinations. *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246 (Pa. 2001). Specifically, "Section 422(a) [of the Act, 77 P.S. § 834,] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. [Thus, u]nless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal."[9] *Pa. Uninsured Emp'rs Guar. Fund v. Workers' Comp. Appeal Bd. (Lyle)*, 91 A.3d 297, 303 (Pa. Cmwlth. 2014) (quoting *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.),* 893 A.2d 191, 195 (Pa. Cmwlth. 2006)). Finally, this Court has held:

> 'In performing a substantial evidence analysis, this [C]ourt
> must view the evidence in a light most favorable to the
> party who prevailed before the factfinder.' 'Moreover, we
> are to draw all reasonable inferences which are deducible
> from the evidence in support of the factfinder's decision in
> favor of that prevailing party.' It does not matter if there is
> evidence in the record supporting findings contrary to those
> made by the WCJ; the pertinent inquiry is whether the
> evidence supports the WCJ's findings.

*3D Trucking Co., Inc., v. Workers' Comp. Appeal Bd. (Fine & Anthony Holdings Int'l)*, 921 A.2d 1281, 1288 (Pa. Cmwlth. 2007) (quoting *Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison),* 819 A.2d 164, 168 (Pa. Cmwlth. 2003)) (citations omitted).

---

[9] Capricious disregard "occurs only when the fact-finder deliberately ignores relevant, competent evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 145 (Pa. Cmwlth. 2004). Capricious disregard, by definition, does not exist where, as here, the WCJ expressly considered and rejected the evidence. *Williams*.

13

The Board in this case concluded that the WCJ did not err in granting the Claim Petition, since Claimant met his burden of proving all of the elements necessary to support the award. Specifically, the Board declared that Claimant was able to meet his burden because Claimant and Dr. Raikin's "credited testimony constituted substantial, competent evidence to support the fact that Claimant sustained a work injury that caused him to be disabled." Board Op. at 5. The Board also agreed that the credible testimony supported the WCJ's findings that Claimant's left-sided Achilles tendon rupture occurred when Claimant was rehabilitating his work injury and, thus, was also work-related.

The WCJ summarized all of the testimony and adequately explained his credibility determinations. Because this Court may not reweigh the evidence or the WCJ's credibility determinations, and must view the evidence in a light most favorable to Claimant, after a thorough review of the record, we agree that Claimant proved the elements necessary to support his Claim Petition. Thus, the WCJ properly granted the Claim Petition. Accordingly, the Board did not err by affirming the WCJ's decision.

Next, Employer asserts that the WCJ erred by granting Claimant's Penalty Petition. Section 435(d) of the Act provides, in relevant part:

> The [D]epartment, the [B]oard, or any court which may hear any proceedings brought under this [A]ct shall have the power to impose penalties as provided herein for violations of the provisions of this [A]ct or such rules and regulations or rules of procedure:
>
> (i) Employers and insurers may be penalized a sum not exceeding ten per centum of the amount awarded and interest accrued and payable: [p]rovided, however, [t]hat such penalty may be increased to fifty per centum in cases of unreasonable or excessive delays. Such penalty shall be payable to the same persons to whom the compensation is payable.

14

77 P.S. § 991(d).[10]  "[A] claimant who files a penalty petition bears the burden of proving a violation of the Act occurred.   If the claimant meets his or her initial burden of proving a violation, the burden then shifts to the employer to prove it did not violate the Act." *Gumm v. Workers' Comp. Appeal Bd. (Steel)*, 942 A.2d 222, 232 (Pa. Cmwlth. 2008) (citation omitted).  Finally, "[t]he assessment of penalties, and the amount of penalties imposed are matters within the WCJ's discretion." *Id.* Thus, "absent an abuse of discretion by the WCJ . . . [a penalty award] will not be overturned on appeal." *Indiana Floral Co. v. Workers' Comp. Appeal Bd. (Brown)*, 793 A.2d 984, 991 n.18 (Pa. Cmwlth. 2002).

> Section 406.1 of the Act provides, in relevant part:
>
> (a) The employer and insurer shall promptly investigate each injury reported or known to the employer and shall proceed promptly to commence the payment of compensation due either pursuant to an agreement upon the compensation payable or a[n NCP] as provided in [S]ection 407 [of the Act] or pursuant to a[n NCP] as set forth in subsection (d), on forms prescribed by the [D]epartment [of Labor and Industry (Department)] and furnished by the insurer.  The first installment of compensation shall be paid not later than the twenty-first day after the employer has notice or knowledge of the employe's disability.  Interest shall accrue on all due and unpaid compensation at the rate of ten per centum per annum.   Any payment of compensation prior or subsequent to an agreement or [NCP] or a notice of temporary compensation payable [(NTCP)] or greater in amount than provided therein shall, to the extent of the amount of such payment or payments, discharge the liability of the employer with respect to such case.
>
> . . . .
>
> (c) If the insurer controverts the right to compensation it shall promptly notify the employe or his dependent, on a form prescribed by the [D]epartment, stating the grounds upon which the right to compensation is controverted and shall forthwith furnish a copy or copies to the [D]epartment.

---

[10] Added by Section 3 of the Act of February 8, 1972, P.L. 25.

(d)(1) In any instance where an employer is uncertain whether a claim is compensable under this [A]ct or is uncertain of the extent of its liability under this [A]ct, the employer may initiate compensation payments without prejudice and without admitting liability pursuant to a [NTCP] as prescribed by the [D]epartment.

(2) The [NTCP] shall be sent to the claimant and a copy filed with the [D]epartment and shall notify the claimant that the payment of temporary compensation is not an admission of liability of the employer with respect to the injury which is the subject of the [NTCP]. The [D]epartment shall, upon receipt of a[n NTCP], send a notice to the claimant informing the claimant that:

(i) the payment of temporary compensation and the claimant's acceptance of that compensation does not mean the claimant's employer is accepting responsibility for the injury or that a compensation claim has been filed or commenced;

(ii) the payment of temporary compensation entitles the claimant to a maximum of ninety (90) days of compensation; and

(iii) the claimant may need to file a claim petition in a timely fashion under [S]ection 315 [of the Act], enter into an agreement with his employer or receive a[n NCP] from his employer to ensure continuation of compensation payments.

(3) Payments of temporary compensation shall commence and the [NTCP] shall be sent within the time set forth in clause (a).

(4) Payments of temporary compensation may continue until such time as the employer decides to controvert the claim.

77 P.S. § 717.1.[11]

In its brief and during its witness deposition testimony, **Employer acknowledged that it did not issue a notice of compensation or any other**

---

[11] Added by Section 3 of the Act of February 8, 1972, P.L. 25.

**documentation to Claimant relative to his accepted work injury, as required by Section 406.1 of the Act, but merely admitted the injury in its Answer to the Claim Petition**. Employer Br. at 9, 15 n.3, 44-45, 51. In its defense, Employer presented the deposition testimony of its human resources vice president Kristie Pappal (Pappal), whose duties include handling workers' compensation claims. *See* R.R. at 207a. She described that since football is a very physical contact sport, Employer's players sustain 800 to 1,000 injuries during the eight months of regular season practice. *See* R.R. at 208a.

Pappal admitted that Employer does not maintain WC files for injured players, nor does it submit all WC claims to Employer's insurance company. Rather, Employer creates WC insurance claims only when treatment is required outside Employer's training room. *See* R.R. at 216a-217a. She acknowledged that she is familiar with the Act, and is aware of the requirements of Section 406.1 of the Act. *See* R.R. at 227a, 230a-231a. Pappal explained that, **due to the high volume of injuries, "[i]t's not practically possible" to formally administer such a high volume of weekly claims by filing NCPs or medical-only NCPs, "[s]o, we have . . . a process by which . . . they are treated and . . . *upon request* we have filed the [m]edical-[o]nly NCPs[.]"** R.R. at 214a (emphasis added); *see also* R.R. at 243a. She stated that Employer submits approximately only four or five injury claims to the insurance company each week. *See* R.R. at 222a. Pappal described that Employer's insurer issues NCPs as necessary, and Employer relies upon its WC attorney to advise her regarding Employer's legal obligations. *See* R.R. at 221, 247a. She clarified that, even if the claims are not formally administered, Employer covers all medical costs related to reported work-related injuries. *See* R.R. at 214a.

Pappal testified that Employer never issued an NCP for Claimant's work injury, but has not denied Claimant's right Achilles tendon rupture, and Employer has covered Claimant's medical bills incurred as a result thereof. *See* R.R. at 210a-212a.

17

She acknowledged, however, that Employer has not paid Claimant anything, including WC benefits, since his contract ended. *See* R.R. at 249a.

The WCJ made the following finding:

22. This [WCJ] finds [] Employer failed to promptly issue a[n NCP] within 21 days after notice or knowledge to [] Employer of [] Claimant's disability in violation of Section 406.1 of the [Act] and Section 121.7(a) of the [Department's Bureau of WC]'s [(Bureau)] rules and regulations. . . . **[T]he record established that Employer was well aware of [] Claimant's work injuries (and the extent thereof) and yet specifically decided not to issue any type of [B]ureau documents**. The violation of the Act is further aggravated because the instant case does not involve minor strains or bruises – injuries that undoubtedly are commonplace each and every day of [Employer's] training camp. Instead, this case involves a serious injury involving the rupture of an Achilles tendon requiring prompt surgical intervention. **Simply admitting to the occurrence of the injury in [] Employer's Answer does not obviate the need for [] Employer to comply with the Act and to issue appropriate [B]ureau documents**. Accordingly, this [WCJ] finds the violation of the Act under these facts to be intentional, excessive, unexcused and prejudicial to [] Claimant. Therefore, I assess a penalty in an amount of 50% on all amounts due and owing under this decision.

WCJ Dec. at 10 (emphasis added; footnote omitted). On appeal, the Board declared that the WCJ did not err by granting the Penalty Petition since Pappal's testimony supported the WCJ's finding that Employer violated Section 406.1 of the Act by failing to accept or deny Claimant's work injury as required. *See* Board Op. at 6-7. Finding no error in either the Board's or the WCJ's reasoning or conclusions in light of the Act's clear requirements and no abuse of the WCJ's discretion, we hold that the Board did not err by affirming the WCJ's grant of Claimant's Penalty Petition.

18

Based upon the foregoing, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Philadelphia Eagles, LLC,      :
               Petitioner      :
                                  :
         v.                    :
                                  :
Workers' Compensation Appeal      :
Board (Abiamiri),              :      No. 165 C.D. 2016
             Respondent      :

## O R D E R

AND NOW, this 6th day of March, 2017, the Workers' Compensation Appeal Board's January 8, 2016 order is affirmed.

_____
ANNE E. COVEY, Judge